**UNITED STATES DISTRICT COURT**
**DISTRICT OF SOUTH CAROLINA**
**CHARLESTON DIVISION**

| | |
|---|---|
| AMANDA M. SLOANE, on behalf of herself and all others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>BLACKBAUD, INC.,<br><br>Defendant. | Case No. _____<br><br><br>JURY TRIAL DEMANDED |

**CLASS ACTION COMPLAINT**

Plaintiff Amanda M. Sloane ("Plaintiff") brings this Class Action Complaint on behalf of herself and all others similarly situated (the "Class"), against Defendant, Blackbaud, Inc. ("Blackbaud" or "Defendant"), alleging as follows based upon information and belief and investigation of counsel, except as to the allegations specifically pertaining to her, which are based on personal knowledge:

**NATURE OF THE CASE**

1.      Businesses that handle sensitive, personally identifying information ("PII") owe a duty of reasonable care to the individuals to whom that data relates. This duty arises because it is foreseeable that the exposure of PII to unauthorized persons—and especially hackers with nefarious intentions—will result in harm to the affected individuals.

2.      This harm manifests in a number of ways, including identity theft and financial fraud, and the exposure of a person's PII through a data breach ensures that that person will be at a substantially increased risk of these crimes compared to the rest of the population, potentially

for the rest of their lives. Mitigating that risk, to the extent it is even possible to do so, requires individuals to devote significant time and money towards closely monitoring their credit, financial accounts, and email accounts, and taking a number of additional measures to protect themselves as much as possible.

3.     Blackbaud is "the world's leading cloud software company powering social good," partnering with many different industries including educational institutions, corporations, non-profits, and healthcare organizations to provide those organizations with software solutions, primarily for fundraising, marketing, and financial management purposes.[1]

4.     After choosing Blackbaud as a cloud solution provider, its clients provide Blackbaud access to data that includes highly sensitive PII, which Blackbaud then stores on its own systems. Through these connections, Blackbaud knowingly obtains consumer PII, and has a resulting duty to securely maintain such information in confidence.

5.     Plaintiff brings this class action on behalf of individual consumers whose PII was accessed and exposed to unauthorized third parties during a data breach of Blackbaud's IT systems, which occurred between February and May of 2020 (the "Data Breach").

6.     Plaintiff, on behalf of herself and a class of all others similarly situated, brings claims herein for negligence, negligence *per se*, unjust enrichment, and declaratory judgment.

7.     The information accessed and exposed during the Data Breach was derived from hundreds or possibly thousands of Blackbaud's institutional clients, which in turn meant the exposure of the PII of millions of individual consumers.

8.     Based on the public statements of Blackbaud and certain of its institutional clients to date, a wide variety of PII was implicated in the breach, including, but not limited to: names,

---

[1] *See generally* https://www.blackbaud.com/

2

residential and business addresses, dates of birth, email addresses, phone numbers, information related to charitable donations made by individuals, and, in some instances, social security numbers, medical information, insurance information, and financial account information.

9.    One of Blackbaud's healthcare industry customers, Pennsylvania-based Allegheny Health Network ("AHN"), recently notified certain of its patients and donors, including Plaintiff, that their PII stored on Blackbaud's systems was accessed and exposed during the Data Breach.

10.    Since the Data Breach, dozens of Blackbaud's other institutional clients have announced—either in public statements, notice letters, or both—that their consumers' PII was also compromised in the Data Breach.

11.    As a direct and proximate result of Blackbaud's inadequate data security, and its breach of its duty to handle PII with reasonable care, Plaintiff and Class Members' PII has been accessed by hackers and exposed to an untold number of unauthorized individuals.

12.    Plaintiff and Class Members are now at a significantly increased risk of fraud, identity theft, and similar forms of criminal mischief, which risk may last for the rest of their lives. Consequently, Plaintiff and Class Members must devote substantially more time, money, and energy towards protecting themselves, to the extent possible, from these crimes.

13.    To recover from Blackbaud for these harms, Plaintiff and the Class seek damages in an amount to be determined at trial, declaratory judgment, and injunctive relief requiring Blackbaud to: 1) disclose, expeditiously, the full nature of the Data Breach, the institutional clients affected, and the types of PII accessed, obtained, or exposed by the hackers; 2) implement improved data security practices to reasonably guard against future breaches of PII possessed by

Blackbaud; and 3) provide, at its own expense, all impacted victims with lifetime identity theft protection services.

## PARTIES

14.     Plaintiff Amanda M. Sloane is an adult individual who at all relevant times has been a citizen and resident of the Commonwealth of Pennsylvania. Plaintiff has previously been a patient at Allegheny Health Network (AHN) facilities.

15.     In December 2020, Plaintiff received a letter from AHN stating that AHN's "Office of Development" was a client of Blackbaud, and that as a result of that relationship, Plaintiff's PII may have been accessed or exposed to unknown, unauthorized third parties during the Data Breach.

16.     Defendant, Blackbaud, Inc., is a Delaware corporation. Defendant has a registered agent in South Carolina with an address of 508 Meeting Street, West Columbia, South Carolina 29169. Defendant's world headquarters are located at 65 Fairchild Street, Charleston, SC 29492.

## JURISDICTION AND VENUE

17.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2)(A), as modified by the Class Action Fairness Act of 2005, because Plaintiff and at least one member of the Class, as defined below, is a citizen of a different state than Defendant, there are more than 100 members of the Class, and the aggregate amount in controversy exceeds $5,000,000 exclusive of interests and costs.

18.     This Court has personal jurisdiction over Defendant because it resides in the State of South Carolina and this District, as evident from the fact that its world headquarters are located here.

4

19.     Venue is proper in this District, pursuant to 28 U.S.C. § 1391(b)(1), because a substantial part of the acts, omissions, and events giving rise to Plaintiff's claims occurred in this District. Further, Defendant resides in this District and is a resident of South Carolina.

## FACTUAL BACKGROUND

### Background on Ransomware Attacks

20.     Ransomware is a well-known and increasingly common form of cyberattack in which the attacker introduces malware to the target's systems. The malware then uses encryption methods to block the victim from using or accessing the targeted system or data.

21.     The malware is typically introduced to the victim's systems through a relatively unsophisticated route: malicious "Trojan" emails sent to specific users who have access to the target's systems. The emails include attachments disguised as ordinary excel files, jpegs, or zip drives, or links that appear to be for package tracking or other innocent purposes. If the user opens the malicious attachment or clicks the link and allows it to download an application, a program will open that either unpacks the ransomware directly or allows the attackers to gain a foothold in the system to launch further attacks.

22.     Once the ransomware is in place, the malware typically includes instructions for contacting the attacker, who then offers to remove the malware or provide a decryption key in exchange for payment, often in the form of Bitcoin or another cryptocurrency. In some instances, referred to by some as "double extortion," the attacker also exfiltrates sensitive data and threatens to release it to the public, or sell it on the "dark web," if the ransom demands are not met.

23.     The number of ransomware attacks increased dramatically during the 2010s, and some well-known variants, such as WannaCry, Locky, and Petya, have been used in thousands of

separate attack incidents. Targets have included all sizes of businesses in virtually every sector, non-profits including hospitals and universities, and government agencies.

**Background of Blackbaud's Business Model**

24.     Blackbaud claims that it is "the world's leading cloud software company powering social good," and that it is "100% focused on driving impact for social good organizations." According to Blackbaud, "[w]e equip change agents with cloud software, services, expertise, and data intelligence designed with unmatched insight and supported with unparalleled commitment."[2]

25.     Blackbaud currently has "Millions of users in 100+ countries" and has helped facilitate through its products "$100 billion+ raised, granted and invested in programing every year by our customers."[3]

26.     Blackbaud offers many different software products to its customers, including Blackbaud CRM, Altru, DonorCentral, Financial Edge NXT, and the company's flagship product, Raiser's Edge NXT, among many others.[4]

27.     These programs perform a variety of functions, including constituent relationship management, cloud-based ticketing and membership, cloud-based financial accounting, cloud-based fundraising, marketing, and donor management software, grantmaking facilitation, and other similar services.[5]

---

[2] https://www.blackbaud.com/ (last visited December 16, 2020).

[3] https://www.blackbaud.com/company

[4] Blackbaud Inc., 2019 Annual Report (Form 10-K), at 7–10 (Feb. 20, 2020) *available at* https://investor.blackbaud.com/static-files/9cd70119-4e13-4d47-b068-3c228c580417.

[5] *Id.*

28.     Blackbaud uses "data center hosting facilities" to provide these cloud-based services, and as Blackbaud itself has stated, "[f]undamental to the use of our solutions is the secure collection, storage, and transmission of confidential donor and end user data and transaction data."[6]

29.     Indeed, Blackbaud markets its cloud-based services as integrated and efficient alternatives for fundraising and organization management as compared to "manual methods," "stand-alone software applications," or an organization developing its own proprietary software.[7]

30.     In short, the very nature of Blackbaud's core business involves providing its clients with a place for the storage and organization of data, including the PII of the institutional clients' own clients, donors, and consumers.

31.     As a result, Blackbaud knows that its customers, and the individuals whose PII is shared with Blackbaud, must rely on Blackbaud to safeguard confidential data entrusted to it.

32.     Blackbaud's filings with the SEC specifically describe the significant operational risks Blackbaud faces in connection with its storage of "confidential donor data" and payment card data. In its 2019 Form 10-K, Blackbaud notes that it is, "from time to time, a target of cyber-attacks and phishing schemes," and that it expected these threats to continue, including the risk of "advanced and persistent cyber-attacks."[8]

33.     Due to the very nature of its business, then, Blackbaud knew that its data center hosting facilities contained sensitive PII and as a result, posed an attractive target for cybercriminals.

---

[6] *Id.* at 20.

[7] *Id.* at 3.

[8] *Id.* at 20.

**The Data Breach and Public Disclosure**

34.     On or around May 14, 2020, Blackbaud discovered that it was the victim of a ransomware attack, which some reports have indicated occurred as early as February 7, 2020.[9]

35.     According to a later statement by the company, it "discovered and stopped" the attack, but before Blackbaud could do so, the attacker(s) "removed a copy of a subset of data from our self-hosted (private cloud) environment."[10]

36.     Blackbaud paid the requested ransom in exchange for supposed "confirmation that the copy [the attackers] removed had been destroyed."[11]

37.     Blackbaud did not publicly disclose the attack until mid-July, 2020. Blackbaud's initial public statements about the attack claimed that the attacker(s) "did not access credit card information, bank account information, or social security numbers."[12]

38.     Despite that representation, Blackbaud later disclosed on September 29, 2020 that:

> Further forensic investigation found that for some of the notified customers, the cybercriminal may have accessed some unencrypted fields intended for bank account information, social security numbers, usernames and/or passwords. In most cases, fields intended for sensitive information were encrypted and not accessible. These new findings do not apply to all customers who were involved in the incident. Customers who this applies to who we believe are using these fields for such

---

[9] *See, e.g.*, Paul Clolery, *The Hack of Blackbaud: Damage is Still Being Assessed*, The Nonprofit Times, Aug. 6, 2020, *available at* https://www.thenonprofittimes.com/npt_articles/the-hack-of-blackbaud-damage-is-still-being-assessed/.

[10] Blackbaud, Security Incident (updated Sept. 29, 2020), *available at* https://www.blackbaud.com/securityincident.

[11] *Id.*

[12] Archived copy of July 19, 2020 version of https://www.blackbaud.com/securityincident, *available at* https://web.archive.org/web/20200719170537/https://www.blackbaud.com/securityincident.

information were contacted the week of September 27, 2020 and were provided with additional support.[13]

39.     In the weeks and months after Blackbaud's first public acknowledgment of the attack, individual consumers began receiving notices about the breach, primarily from Blackbaud's institutional clients, with whom individual consumers had relationships.

40.     For instance, Plaintiff received a letter from AHN dated December 4, 2020, indicating that AHN's Office of Development was "recently notified" by Blackbaud that the "copy of some customer data" obtained by the cyberattacker(s) included data belonging to AHN's Office of Development, which in turn may have contained Plaintiff's "name, date of birth, address, business address, phone numbers, and e-mail addresses," as well as potentially "information related to" any gifts Plaintiff may have donated to AHN. The letter did not further specify the nature of the donation-related information that may have been compromised.

41.     AHN's letter encouraged Plaintiff to "remain vigilant and monitor your personal records and financial accounts," and take additional steps such as obtaining credit reports and continuing to monitor for suspected identity theft for "the next 12 to 24 months."

42.     News reports indicate that AHN notified nearly 300,000 individuals that their information may have been compromised in the Blackbaud Data Breach.[14]

---

[13] Blackbaud, Security Incident (updated Sept. 29, 2020), *available at* https://www.blackbaud.com/securityincident.

[14] David Bruce, *AHN donor information exposed in ransomware attack*, Erie Times-News, Dec. 13, 2020, *available at* https://www.goerie.com/story/business/2020/12/13/david-bruce-ahn-donor-information-exposed-ransomware-attack/6506130002/.

43.     According to data compiled by the Identity Theft Resource Center (IRTC), at least 440 organizations and 11 million individuals in the United States have been identified as affected by the Blackbaud Data Breach.[15]

**Blackbaud Knew the Risks of Storing PII and the Foreseeable Harm to Victims**

44.     At all relevant times, Blackbaud knew it was storing valuable, sensitive PII and that as a result, Blackbaud's systems would be attractive targets for cybercriminals.

45.     Blackbaud also knew that any breach of its systems, and exposure of the information stored therein, would result in the increased risk of identity theft and fraud against the individuals whose PII was compromised.

46.     These risks are not merely theoretical; in recent years, numerous high-profile breaches have occurred at businesses such as Equifax, Yahoo, Marriott, Anthem, and many others.

47.     PII has considerable value and constitutes an enticing and well-known target to hackers.  Hackers easily can sell stolen data as a result of the "proliferation of open and anonymous cybercrime forums on the Dark Web that serve as a bustling marketplace for such commerce."[16]

48.     The prevalence of data breaches and identity theft has increased dramatically in recent years, accompanied by a parallel and growing economic drain on individuals, businesses, and government entities in the U.S.  According to the IRTC, in 2019, there were 1,473 reported

---

[15] *See* Identity Theft Resource Center, "notified" Dashboard, https://notified.idtheftcenter.org/s/ (accessed December 16, 2020).

[16] Brian Krebs, *The Value of a Hacked Company*, Krebs on Security (July 14, 2016), http://krebsonsecurity.com/2016/07/the-value-of-a-hacked-company/.

data breaches in the United States, exposing 164 million sensitive records and 705 million "non-sensitive" records.[17]

49.      In tandem with the increase in data breaches, the rate of identity theft and the resulting losses has also increased over the past few years. For instance, in 2018, 14.4 million people were victims of some form of identity fraud, and 3.3 million people suffered unrecouped losses from identity theft, nearly three times as many as in 2016. And these out-of-pocket losses more than doubled from 2016 to $1.7 billion in 2018.[18]

50.      Even if stolen PII does not include financial or payment card account information, that does not mean there has been no harm, or that the breach does not cause a substantial risk of identity theft. Freshly stolen information can be used with success against victims in specifically targeted efforts to commit identity theft known as social engineering or spear phishing. In these forms of attack, the criminal uses the previously obtained PII about the individual, such as name, address, email address, and affiliations, to gain trust and increase the likelihood that a victim will be deceived into providing the criminal with additional information.

51.      Stolen names and email addresses can also facilitate attacks known as "credential stuffing," where the attacker, armed with a known valid email address, can attempt to log-in to online accounts using the common formulas for usernames (email address, first initial and last name, or full name) and common passwords, or use software to mount a brute-force attack (guessing many passwords in rapid succession) against weak login portals.

---

[17] *Data Breach Reports: 2019 End of Year Report*, IDENTITY THEFT RESOURCE CENTER, at 2, *available at* https://notified.idtheftcenter.org/s/resource#annualReportSection.

[18] Insurance Information Institute, *Facts + Statistics: Identity theft and cybercrime*, available at https://www.iii.org/fact-statistic/facts-statistics-identity-theft-and-cybercrime#Identity%20Theft%20And%20Fraud%20Reports,%202015-2019%20(1) (last accessed Dec. 16, 2020).

**Plaintiff and Class Members Suffered Damages**

52.     For the reasons mentioned above, Blackbaud's negligence, which allowed the Data Breach to occur, caused Plaintiff and the Class significant injuries and harm in several ways. Plaintiff and the Class must immediately devote time, energy, and money towards: 1) closely monitoring their credit, financial accounts, email and other accounts; 2) changing login and password information on any sensitive account even more frequently than they already do; 3) more carefully screening and scrutinizing phone calls, emails, and other communications to ensure that they are not being targeted in a social engineering or spear phishing attack; 4) searching for suitable identity theft protection and credit monitoring services, and paying to procure them.

53.     Once PII is exposed, there is virtually no way to ensure that the exposed information has been fully recovered or contained against future misuse. For this reason, Plaintiff and Class members will need to maintain these heightened measures for years, and possibly their entire lives, as a result of Blackbaud's negligence.

54.     Blackbaud's delay in identifying and reporting the Data Breach caused additional risk and harm to Plaintiff and Class Members that would not have occurred if Blackbaud had acted more quickly to notify affected organizations and individuals about the Data Breach. Although their PII was improperly exposed as early as early February, 2020, Blackbaud did not publicly announce the Data Breach until mid-July, 2020.

55.     Even then, Plaintiff and Class Members whose PII was compromised due to their relationships with certain of Blackbaud's clients did not receive notice until much later. For instance, AHN did not notify Plaintiff until December 4, 2020, and represented in its letter than it had only recently been notified by Blackbaud that AHN's patient/donor information was

implicated in the breach. This delayed notice deprived Plaintiff and Class Members of the ability
to promptly mitigate potential adverse consequences resulting from the Data Breach.

56.    Plaintiff and Class members are also at a continued risk because their information
remains in Blackbaud's systems, which have already been shown to be susceptible to
compromise and attack.

## CLASS ALLEGATIONS

57.    Plaintiff brings this case individually and, pursuant to Rule 23 of the Federal
Rules of Civil Procedure, on behalf of the class defined as:

> All individuals in the United States whose PII was compromised in the Blackbaud data
> breach which occurred in May 2020.

58.    Excluded from the Class is Defendant, its subsidiaries and affiliates, its officers,
directors and members of their immediate families and any entity in which Defendant has a
controlling interest, the legal representative, heirs, successors, or assigns of any such excluded
party, the judicial officer(s) to whom this action is assigned, and the members of their immediate
families.

59.    Plaintiff reserves the right to modify or amend the definition of the proposed
Class prior to moving for class certification.

60.    The requirements of Rule 23(a)(1) are satisfied.  The class described above is so
numerous that joinder of all individual members in one action would be impracticable.  The
disposition of the individual claims of the respective class members through this class action will
benefit both the parties and this Court. The exact size of the class and the identities of the
individual members thereof are ascertainable through Defendant's records, including but not

limited to, the files implicated in the Data Breach, but based on public information, the Class

includes millions of individuals.

61.     The requirements of Rule 23(a)(2) are satisfied.  There is a well-defined

community of interest and there are common questions of fact and law affecting members of the

Class. The questions of fact and law common to the Class predominate over questions which

may affect individual members and include the following:

      a.     Whether Defendant had a duty to protect the PII of Plaintiff and Class Members;

      b.     Whether Defendant was negligent in collecting and storing Plaintiff's and Class
           Members' PII, and breached it duties thereby;

      c.     Whether Defendant adequately, promptly, and accurately informed its clients, and
           in turn Plaintiff and Class Members, that their PII had been compromised;

      d.     Whether Plaintiff and Class Members are entitled to damages as a result of
           Defendant's wrongful conduct;

      e.     Whether Plaintiff and Class Members are entitled to restitution as a result of
           Defendant's wrongful conduct; and

      f.     Whether Plaintiff and Class Members are entitled to injunctive relief to redress
           the imminent and currently ongoing harm faced as a result of the Data Breach.

62.     The requirements of Rule 23(a)(3) are satisfied. Plaintiff's claims are typical of

the claims of the members of the Class.  The claims of the Plaintiff and members of the Class are

based on the same legal theories and arise from the same failure by Defendant to safeguard PII.

63.     Plaintiff and members of the Class were each consumers who had relationships

with organizations that were clients of Blackbaud, each having their PII obtained by an

unauthorized third party.

64.     The requirements of Rule 23(a)(4) are satisfied. Plaintiff is an adequate representative of the class because her interests do not conflict with the interests of the members of the Class.  Plaintiff will fairly, adequately, and vigorously represent and protect the interests of the members of the Class and has no interests antagonistic to the members of the Class.  In addition, Plaintiff has retained counsel who are competent and experienced in the prosecution of class action litigation. The claims of Plaintiff and the Class members are substantially identical as explained above.

65.     The requirements of Rule 23(b)(3) are satisfied here because a class action is the superior method of litigation these issues, and common issues will predominate. While the aggregate damages that may be awarded to the members of the Class are likely to be substantial, the damages suffered by the individual members of the Class are relatively small.  As a result, the expense and burden of individual litigation make it economically infeasible and procedurally impracticable for each member of the Class to individually seek redress for the wrongs done to them.  Certifying the case as a Class will centralize these substantially identical claims in a single proceeding, which is the most manageable litigation method available to Plaintiff and the Class and will conserve the resources of the parties and the court system, while protecting the rights of each member of the Class. Defendant's uniform conduct is generally applicable to the Class as a whole, making relief appropriate with respect to each Class member.

**FIRST CAUSE OF ACTION**
**NEGLIGENCE**
**(On Behalf of Plaintiff and the Class)**

66.     Plaintiff restates and realleges all proceeding allegations above as if fully set forth herein.

15

67.     Blackbaud owed a duty under common law to Plaintiff and Class Members to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting and protecting their PII in its possession from being compromised, lost, stolen, accessed and misused by unauthorized persons.

68.     Blackbaud's duty to use reasonable care arose from several sources, including but not limited to those described below.

69.     Blackbaud had a common law duty to prevent foreseeable harm to others. This duty existed because Plaintiff and Class Members were the foreseeable and probable victims of any inadequate security practices on the part of Defendant. By collecting and storing valuable PII that is routinely targeted by criminals for unauthorized access, Blackbaud was obligated to act with reasonable care to protect against these foreseeable threats.

70.     Blackbaud's duty also arose from Blackbaud's position as a vendor to healthcare, educational, and other organizations. Blackbaud undertakes its collection of highly sensitive information generally without the knowledge or consent of consumers and consumers cannot "opt out" of Blackbaud's data collection activities. Blackbaud holds itself out as a trusted steward of consumer data, and thereby assumes a duty to reasonably protect that data. Because of its role as a cloud computing vendor to a large number of organizations, Blackbaud was in a unique and superior position to protect against the harm suffered by Plaintiff and Class Members as a result of the Data Breach.

71.     Timely notification was required, appropriate and necessary so that, among other things, Plaintiff and Class Members could take appropriate measures to freeze or lock their credit profiles, avoid unauthorized charges to their credit or debit card accounts, cancel or change usernames and passwords on compromised accounts, monitor their account information and

credit reports for fraudulent activity, contact their banks or other financial institutions that issue their credit or debit cards, obtain credit monitoring services, and take other steps to mitigate or ameliorate the damages caused by Blackbaud's misconduct.

72.     Blackbaud breached the duties owed to Plaintiff and Class Members and thus was negligent. Blackbaud breached these duties by, among other things: (a) mismanaging its system and failing to identify reasonably foreseeable internal and external risks to the security, confidentiality, and integrity of customer information that resulted in the unauthorized access and compromise of PII; (b) mishandling its data security by failing to assess the sufficiency of its safeguards in place to control these risks; (c) failing to design and implement information safeguards to control these risks; (d) failing to adequately test and monitor the effectiveness of the safeguards' key controls, systems, and procedures; (e) failing to evaluate and adjust its information security program in light of the circumstances alleged herein; (f) failing to detect the breach at the time it began or within a reasonable time thereafter; and (g) failing to promptly disclose that Plaintiff's and Class Members' PII in Blackbaud's possession had been or was reasonably believed to have been, accessed or compromised.

73.     But for Blackbaud's wrongful and negligent breach of its duties owed to Plaintiff and Class Members, their PII would not have been compromised.

74.     As a direct and proximate result of Blackbaud's negligence, Plaintiff and Class Members have suffered injuries, including:

   a.   Theft of their PII;

   b.   Costs associated with requested credit freezes;

   c.   Costs associated with the detection and prevention of identity theft and unauthorized use of the financial accounts;

d.  Costs associated with purchasing credit monitoring and identity theft protection services;

e.  Unauthorized charges and loss of use of and access to their financial account funds and costs associated with inability to obtain money from their accounts or being limited in the amount of money they were permitted to obtain from their accounts, including missed payments on bills and loans, late charges and fees, and adverse effects of their credit;

f.  Lowered credit scores resulting from credit inquiries following fraudulent activities;

g.  Costs associated with time spent and the loss of productivity from taking time to address and attempt to ameliorate, mitigate, and deal with the actual and future consequences of the Blackbaud Data Breach – including finding fraudulent charges, cancelling and reissuing cards, enrolling in credit monitoring and identity theft protection services, freezing and unfreezing accounts, and imposing withdrawal and purchase limits on compromised accounts;

h.  The imminent and certainly impending injury flowing from the increased risk of potential fraud and identity theft posed by their PII being placed in the hands of criminals;

i.  Damages to and diminution in value of their PII entrusted, directly or indirectly, to Blackbaud with the mutual understanding that Blackbaud would safeguard Plaintiff's and Class Members data against theft and not allow access and misuse of their data by others; and

j. Continued risk of exposure to hackers and thieves of their PII, which remains in Blackbaud's possession and is subject to further breaches so long as Blackbaud fails to undertake appropriate and adequate measures to protected Plaintiff.

75. As a direct and proximate result of Blackbaud's negligence, Plaintiff and Class Members are entitled to damages, including compensatory, punitive, and/or nominal damages, in an amount to be proven at trial.

### SECOND CAUSE OF ACTION
### NEGLIGENCE PER SE
### (On Behalf of Plaintiff and the Class)

76. Plaintiff restates and realleges all proceeding factual allegations above as if fully set forth herein.

77. Section 5 of the FTC Act prohibits "unfair . . . practices in or affecting commerce" including, as interpreted and enforced by the FTC, the unfair act or practice by companies such as Blackbaud or failing to use reasonable measures to protect PII. Various FTC publications and orders also form the basis of Blackbaud's duty.

78. Blackbaud violated Section 5 of the FTC Act (and similar state statutes) by failing to use reasonable measures to protect PII and not complying with the industry standards. Blackbaud's conduct was particularly unreasonable given the nature and amount of PII it obtained and stored and the foreseeable consequences of a data breach involving PII of non-profit organizations' donors, clients, and consumers.

79. Blackbaud's violation of Section 5 of the FTC Act (and similar state statutes) constitutes negligence *per se*.

80. Plaintiff and Class Members are consumers within the class of persons Section 5 of the FTC Act (and similar state statutes) was intended to protect.

81.     Moreover, the harm that has occurred is the type of harm that the FTC Act (and similar state statutes) was intended to guard against. Indeed, the FTC has brought dozens of enforcement actions against businesses which, as a result of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm suffered by Plaintiff and Class Members.

82.     As a direct and proximate result of Blackbaud's negligence, Plaintiff and Class Members have been injured as described herein, and are entitled to damages, including compensatory, punitive, and nominal damages, in an amount to be proven at trial.

### THIRD CAUSE OF ACTION
### UNJUST ENRICHMENT
### (On Behalf of Plaintiff and the Class)

83.     Plaintiff restates and realleges all proceeding allegations above as if fully set forth herein.

84.     Plaintiff and Class Members have an interest, both equitable and legal, in the PII about them that was conveyed to, collected by, and maintained by Blackbaud and that was ultimately accessed or compromised in the Blackbaud Data Breach.

85.     Blackbaud benefitted by the conferral upon it of the PII pertaining to Plaintiff and Class Members and by its ability to retain and use that information. Blackbaud understood that it was in fact so benefitted.

86.     Blackbaud also understood and appreciated that the PII pertaining to Plaintiff and Class Members was private and confidential and its value depended upon Blackbaud maintaining the privacy and confidentiality of that PII.

87.     Plaintiff and the Class's PII would not have been transferred to and entrusted with Blackbaud but for its express and implied commitments to its clients that the PII would be maintained safely and securely.

88.     As a result of Blackbaud's wrongful conduct as alleged in this Complaint (including among other things its utter failure to employ adequate data security measures, its continued maintenance and use of the PII belonging to Plaintiff and Class Members without having adequate data security measures, and its other conduct facilitating the theft of that PII), Blackbaud has been unjustly enriched at the expense of, and to the detriment of, Plaintiff and Class Members.

89.     Blackbaud's unjust enrichment is traceable to, and resulted directly and proximately from, the conduct alleged herein, including the compiling and use of Plaintiff's and Class Members' sensitive PII, while at the same time failing to maintain that information secure from intrusion and theft by hackers and identify thieves.

90.     Under the common law doctrine of unjust enrichment, it is inequitable for Blackbaud to be permitted to retain the benefits it received, and is still receiving, without justification, from the use of Plaintiff and Class Members' PII in an unfair and unconscionable manner. Blackbaud's retention of such benefits under circumstances making it inequitable to do so constitutes unjust enrichment.

91.     The benefit conferred upon, received, and enjoyed by Blackbaud was not conferred officiously or gratuitously, and it would be inequitable and unjust for Blackbaud to retain the benefit.

92.     Blackbaud is therefore liable to Plaintiff and Class Members for restitution in the amount of the benefit conferred on Blackbaud as a result of its wrongful conduct, including

specifically the value to Blackbaud of the PII that was stolen in the Blackbaud Data Breach and the profits Blackbaud received from the use of that information.

**FOURTH CAUSE OF ACTION**
**DECLARATORY JUDGMENT**
**(On Behalf of Plaintiff and the Class)**

93.    Plaintiff restates and realleges all proceeding allegations above as if fully set forth herein.

94.    Under the Declaratory Judgment Act, 28 U.S.C. §§ 2201, *et seq.*, this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and grant further necessary relief. Furthermore, the Court has broad authority to restrain acts, such as here, that are tortious and violate the terms of the federal and state statutes described in this Complaint.

95.    An actual controversy has arisen in the wake of the Blackbaud Data Breach regarding Plaintiff's and Class Members' PII and whether Blackbaud is currently maintaining data security measures adequate to protect Plaintiff's and Class Members from further data breaches that compromise their PII. Plaintiff alleges that Blackbaud's data security measures remain inadequate. Blackbaud denies these allegations. Furthermore, Plaintiff continues to suffer injury as a result of the compromise of her PII and remains at imminent risk that further compromises of her PII will occur in the future.

96.    Pursuant to its authority under the Declaratory Judgment Act, this Court should enter a judgment declaring, among other things, the following:

      a.    Blackbaud owes a legal duty to secure consumers' PII and to timely notify consumers of a data breach under the common law, Section 5 of the FTC Act, HIPAA, and various state statutes; and

      b.   Blackbaud continues to breach this legal duty by failing to employ reasonable measures to secure consumers' PII.

97.    This Court also should issue corresponding prospective injunctive relief requiring Blackbaud to employ adequate security protocols consistent with law and industry standards to protect consumers' PII.

98.    If an injunction is not issued, Plaintiff will suffer irreparable injury, and lack an adequate legal remedy, in the event of another data breach at Blackbaud. The risk of another such breach is real, immediate, and substantial. If another breach at Blackbaud occurs, Plaintiff will not have an adequate remedy at law because many of the resulting injuries are not readily quantified and they will be forced to bring multiple lawsuits to rectify the same conduct.

99.    The hardship to Plaintiff if an injunction does not issue exceeds the hardship to Blackbaud if an injunction is issued. Plaintiff will likely be subjected to substantial identity theft and other damage. On the other hand, the cost to Blackbaud of complying with an injunction by employing reasonable prospective data security measures is relatively minimal, and Blackbaud has a pre-existing legal obligation to employ such measures.

100.    Issuance of the requested injunction will not disserve the public interest. To the contrary, such an injunction would benefit the public by preventing another data breach at Blackbaud, thus eliminating the additional injuries that would result to Plaintiff and consumers whose confidential information would be further compromised.

## PRAYER FOR RELIEF

WHEREFORE Plaintiff on behalf of herself and all other similarly situated, prays for relief as follows:

a.      For an order certifying the Class under Rule 23 of the Federal Rules of

Civil Procedure and naming Plaintiff as representative of the Class and Plaintiff's

attorneys as Class Counsel to represent the Class;

b.      For an order finding in favor of Plaintiff and the Class on all counts

asserted herein;

c.      For damages in an amount to be determined by the trier of fact;

d.      For an order of restitution and all other forms of equitable monetary relief;

e.      Declaratory and injunctive relief as described herein;

f.      Awarding Plaintiff's reasonable attorneys' fees, costs, and expenses;

g.      Awarding pre- and post-judgment interest on any amounts awarded; and,

h.      Awarding such other and further relief as may be just and proper.

## <u>JURY TRIAL DEMAND</u>

A jury trial is demanded on all claims so triable.

Dated: December 17, 2020                          Respectfully submitted,


**RICHARDSON, PATRICK,
WESTBROOK & BRICKMAN, LLC**

/s/ T Christopher Tuck.
T. Christopher Tuck, ID No.: 9135
E-mail:  ctuck@rpwb.com
T.A.C. Hargrove, II, ID No.: 12487
E-mail: thargrove@rpwb.com
1037 Chuck Dawley Blvd.
Building A
Mt. Pleasant, SC  29464
843-727-6500 – Telephone
843-216-6509 – Facsimile

24

**PENDING ADMISSION *PRO HAC VICE***

**CARLSON LYNCH, LLP**
Gary F. Lynch
E-mail: glynch@carlsonlynch.com
Kelly K. Iverson
E-mail: kiverson@carlsonlynch.com
Jamisen A. Etzel
E-mail: jetzel@carlsonlynch.com
Nicholas A. Colella
E-mail: ncolella@carlsonlynch.com
1133 Penn Avenue, 5th Floor
Pittsburgh, PA 15222
412-322-9243 – Telephone
412-231-0246– Facsimile

**ATTORNEYS FOR PLAINTIFF**